**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

EDWARD ABRUSCATO,

Plaintiff,

v. Case No: 3:13-cv-962-J-39JBT

GEICO GENERAL INSURANCE COMPANY,

Defendant.
_______________________________/

# ORDER

**THIS CAUSE** is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 80) and Defendant's Motion for Summary Judgment (Doc. 86). The Court considered both Motions and their respective responses in opposition (Docs. 97 and 100). Additionally, the Court considered Defendant's Reply (Doc. 110) to Plaintiff's Response (Doc. 100). Accordingly, the matters are now ripe for review.

## A. Background

Plaintiff, Edward Abruscato ("Mr. Abruscato") initiated this case with his Complaint filed on August 8, 2013. (Doc. 1). The Complaint rests on a charge of bad faith against Defendant, GEICO General Insurance Company ("GEICO") for GEICO's handling of claims made against Mr. Abruscato. The claims arose after a traffic accident in Clay County, Florida left three people dead and six more injured. Three vehicles were involved in the accident, including one driven by Mr. Abruscato. All three drivers were insured by GEICO, which, in the ensuing claims process assigned Mr. Abruscato 100% fault for the accident. Mr. Abruscato's insurance policy was limited to $100,000.00 of

coverage. GEICO, on behalf of Mr. Abruscato, eventually settled two of the three wrongful death claims within his policy limits. The unsettled claim went to trial and resulted in a multimillion dollar verdict against Mr. Abruscato. Mr. Abruscato now alleges GEICO acted in bad faith by not settling the third claim when it had the chance, and by GEICO's conduct in the ensuing state court civil trial.[1] The parties both allege the undisputed facts make summary judgment appropriate in their respective favor.

**B. Standard of Review**

As both motions under consideration are for summary judgment, the Court first looks for applicable standards of review. Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a court reviews cross-motions for summary judgment the guiding principles of summary judgment remain the same and "the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." T-Mobile S. LLC v. City of Jacksonville, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). "[T]he filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist." Byce v. Pruco Life Ins. Co., No. 1:09-CV-1912-RWS, 2011 WL 233390, at *3 (N.D. Ga. Jan. 21, 2011).

In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary

---

[1] GEICO provided Mr. Abruscato's legal defense during the trial relating to the unsettled wrongful death claim.

judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

**C. Common Law Third Party Bad Faith Claim**

Mr. Abruscato brings this cause of action pursuant to Florida common law on third party bad faith insurance claims. (See Doc. 1). The Florida Supreme Court has

explained "[w]hen handling claims against its insured, an insurer 'has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.'" Macola v. GEICO, 953 So. 2d 451, 454 (Fla. 2006) (quoting Boston Old Colony Ins. Co. v. Guiterrez, 386 So. 2d 783, 785 (Fla. 1980)). More specifically, Macola reaffirms the Florida Supreme Court's previous explanation of an insurer's duty to act in good faith based on the "totality of the circumstances" as one which

> obligates the insurer [1] to advise the insured of settlement opportunities, [2] to advise as to the probable outcome of the litigation, [3] to warn of the possibility of an excess judgment, and [4] to advise the insured of any steps he might take to avoid same. The insurer must [also] [5] investigate facts, [6] give fair consideration to a settlement offer that is not unreasonable under the facts, and [7] settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

Id. at 455; see also Barnard v. Geico General Ins. Co., 448 F. App'x 940, 943 (11th Cir. 2011). Once an insured has breached this duty of good faith, the claimant must establish the breach caused damages to the claimant. Perera v. U.S. Fidelity and Guar. Co., 35 So. 3d 893, 902 (Fla. 2010). Thus, for Mr. Abruscato's Motion to succeed he must show the undisputed facts establish the elements of a bad faith claim such that no reasonable juror could disagree. Conversely, GEICO's Motion's success depends on whether the undisputed facts require a reasonable juror to find that Mr. Abruscato cannot prevail on his claim.

## D. Undisputed Facts

This case arises from a multi-car traffic accident on November 8, 2006. (Doc. 87.2, p. 3). Three people died as a result of the accident, and six more were injured. Id. The driver of "Car One" was Mr. Abruscato. (Doc. 80.1, p. 4). Mr. Abruscato carried

three minor teenage passengers in his vehicle, including K.L.R. who died as a result of the crash. (Id. at 5). K.L.R. was not wearing a seat belt. Id.

Vincent Swanda ("Mr. Swanda") was the driver of "Car Two." Id. Mr. Swanda was alone in his car and "he sustained non-incapacitating injuries as a result of the crash." (Id. at 5-6).

Jeffery Spear ("Mr. Spear"), the driver of "Car Three" died as a result of the crash. (Id. at 6). Mr. Spear carried three passengers in his vehicle, including C.A.S. who also died as a result of the accident. Id. at 6-7. While Mr. Spear was not wearing a seatbelt, C.A.S. was. Id.

Following the accident, the Florida Highway Patrol ("FHP") conducted an investigation which yielded a Traffic Homicide Report ("Investigative Report").[2] The Investigative Report details the accident: the accident occurred as Car One, travelling west, ignored a stop sign and pulled out in front of Car Two, which was travelling north. Id. at 8. Car Two struck Car One on its left side pushing Car One into the southbound lane of traffic. Id. Car Three, which was travelling south then hit Car One head-on. Id. This collision redirected Car Three into Car Two where the three vehicles eventually came to a rest. Id. at 8-9. The accident occurred during the daytime, and the speed limit on the north and south bound lanes was 55 miles per hour ("mph"). Id. The west bound lane had a speed limit of 25mph and was regulated by a stop sign where it intersected the north and south bound lanes. Id.

[2] The Court does not necessarily adopt the Report as a perfect accounting of the accident, but rather cites the Report as it bears on GEICO's handling of the ensuing insurance claims. However, the Court could consider many of the facts as true as they are undisputed and reducible to admissible form at trial. Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999).

Two witnesses, including a passenger in Car One, saw Car One driving recklessly immediately prior to the accident. Id. at 11. Both witnesses indicated Car One was travelling between 45-50mph in the 25mph west bound lane. Id. The witness from inside of Car One said Mr. Abruscato, was "showing off" for his teenage passengers. Id. The account of the two witnesses matches Mr. Swanda's statement that he saw Car One travelling west as a blue blur just before the first impact. Id. at 8.

The Investigative Report also notes that Dr. Arruza of the Duval County Medical Examiner's Office performed an autopsy on Mr. Spear. Id. at 13. While his cause of death was attributed to the car accident, the toxicology report showed that Mr. Spear's blood was positive for carisoprodol, meprobamate, morphine, and tramadol. Id. Mr. Spear's urine also tested positive for carisoprodol, meprobamate, morphine and tramadol as well as caffeine, nicotine and metabolite. Id. Dr. Arruza opines that Mr. Spear was impaired at the time of the accident. Id. at 15. The report also notes that Car Three was travelling approximately 60mph just before impact, as opposed to the 61mph five seconds before. Id. at 14. Car One was travelling 32mph five seconds before impact and 48mph 1 second before impact. Id.

In its summary section, the Investigative Report concludes that Mr. Abruscato's reckless driving "resulted in the deaths of three people and the serious bodily injuries of two others." Id. at 16. It goes on to say that Mr. Spear was driving under the influence, but in an otherwise lawful manner and that Mr. Swanda likewise, was driving lawfully. Id. The report closes by noting a warrant was obtained for the arrest of Mr. Abruscato. Id. at 17.

All three drivers were covered by GEICO, which was notified of the accident the same day. (Doc. 87.3 p. 1). On the following day, Kathleen Watkins ("Ms. Watkins"), a supervisor with GEICO, began GEICO's accident investigation by contacting an attorney, Matthew Posgay ("Posgay") and seeking an accident reconstruction expert. (Id.). Posgay was eventually retained by GEICO to represent Mr. Abruscato's interests in the settlement process. See Id. at 12; (see also Doc. 87.12). Ms. Watkins assigned James Torchio ("Mr. Torchio") to assess Mr. Abruscato's liability for the accident and handle any claims made against him. (Doc. 87-3, p. 1). In resolving the claims, Mr. Torchio allocated 100% fault to Mr. Abruscato and 0% fault to Mr. Swanda and Mr. Spear. (Doc. 84.5, p. 2).

Both parties agree that Mr. Abuscato's policy only provided coverage of up to $100,000.00 per accident. On February 23, 2007, GEICO informed Mr. Abruscato of the limits of his policy; advised him of the risk of excess claims; his right to retain outside counsel; and his option to contribute toward any future settlements in excess of his policy limits. (Doc. 87.19).In an attempt to stay within the policy limits, GEICO sought to resolve all of the claims through a global settlement conference. (E.g. Doc. 87.13; 87.20). The conference took place on March 26, 2007, (Doc. 87.20), but the parties were unable to come to an agreement on how Mr. Abruscato's policy limits should be divided. (Doc. 87.22).

Before the mediation conference took place, it became clear Mr. Abruscato's policy limits would be insufficient to cover all of the claims made against him. On February 5, 2007, Posgay informed GEICO of a claim by a living passenger for $127,000.00 in medical expenses alone. (Doc. 87-16). By April 4, 2007, the parents of

K.L.R. ("the Rays") offered to settle their claims from her death for $200,000.00. (Doc. 87.23). On the same day, Mrs. Spear's attorney (representing the wife of Mr. Spear and mother of C.A.S.) sent a letter to GEICO which expressed her assumption that GEICO would not "deplete any of the inadequate $100,000.00 liability coverage limits without consulting with us" regarding the claims from the deaths of C.A.S. and Mr. Spear (Doc. 87.24). The same letter claimed Mrs. Spear's claims "represent the most significant excess judgment risk to Mr. Abruscato" because she lost both her child and "her husband who was the sole bread winner and supporter of her family." Id. GEICO forwarded the offer to settle the claims from K.L.R.'s death to Mr. Abruscato on April 11, 2007, and asked if he was willing to contribute to settling the claims. (Doc. 87.28). The Abruscatos informed GEICO they had nothing to contribute to settling the claims against him. (E.g. Doc 87.61, p. 17). The next day on April 12, 2007, Mrs. Spear offered to the settle the claims related to the death of Mr. Spear and C.A.S for $150,000.00 each. (Doc. 87.29). On April 13, 2003, Mr. Torchio sent a follow-up letter to the Abruscatos which confirmed that the Abruscatos would prefer to resolve all of the claims except K.L.R.'s if universal settlement was unobtainable. Doc. 87-30.[3] In response, Posgay wrote a letter on April 16, 2007, to those asserting claims against Mr. Abruscato expressing his willingness to work with everyone to resolve their claims within the policy limits as Mr. Abruscato could not personally contribute to the settlement.

---

[3] Mr. Abruscato's claims his statements are inadmissible as hearsay; he does not dispute what Mr. Torchio says he said in their conversation. (Doc. 100, p. 2). Rule 801 of the Federal Rules of Evidence provides that an opposing party's statement made in the party's individual or representative capacity is not hearsay when offered against that party. As Geico is offering the statements of Mr. Abruscato against Mr. Abruscato, his statements are admissible.

Accordingly, Mr. Torchio informed the parents of K.L.R. and Mrs. Spear that their offer to settle was not accepted. (Docs. 87.32 and 87.34). Mr. Tochio went on to invite the claimants to participate in another global settlement in hopes of resolving their claims. Id. On May 17, 2007, Posgay informed Mr. Torchio that the Rays inquired as to whether Posgay would settle the Rays claims for $50,000.00, to which Posgay responded that Mrs. Spear needed to be consulted to work out all three claims. (Doc. 87.36). On August 18, 2007, the parents of K.L.R. formally offered to settle their claims, which they considered to pose the largest threat to Mr. Abruscato, for $50,000.00 with a condition that their offer be accepted within twenty days. (Doc. 87-45). Id. The offer warned that if the Rays' offer was not accepted, they would file suit. Id. Posgay responded to the offer seeking to clarify the expiration date of the offer while encouraging the Rays to work with Mrs. Spear to achieve global settlement within the policy limits. (Doc. 87.47). On August 30, 2007, Posgay informed GEICO that the attorney's for Mrs. Spear and the Rays discussed settling their claims within the policy limits in consideration of the Rays most recent offer. (Doc. 87.5 at 3). By September 4, 2007, the Rays informed GEICO that they could not agree with Mrs. Spear on the allocation of the policy limits. Id. On September 7, 2007, Mr. Torchio rejected the Rays offer. (Doc. 87.48). Less than two weeks later, the Rays filed a lawsuit, which resulted in a $4,009,564.62 verdict against Mr. Abruscato. (Docs. 87.49 and 87.59).

After the Rays filed suit, but well before the civil trial, Mrs. Spear offered to settle the claims from the deaths of Mr. Spear and C.A.S. for $66,000.00 total. (Doc. 87.50). Her offer was accepted on November 5, 2007. (Doc. 87.52). Following settlement with Mrs. Spear, GEICO offered the remainder of the policy limits, $34,000.00 to the Rays,

which they promptly rejected. (Doc. 87.54). When a new attorney began representing the Rays, GEICO again tried to settle their claims against Mr. Abruscato, without success, for $38,500.00. (Doc. 87.56).

**E. Discussion**

i. Duty to investigate

Mr. Abruscato's primary claim is that GEICO acted in bad faith by not settling the claims from the death of K.L.R. when it should have settled those claims. As GEICO was faced with multiple claims that exceeded the policy limits it had "discretion in how it elect[ed] to settle claims," including the ability to "settle certain claims to the exclusion of others." Gen. Sec. Nat. Ins. Co. v. Marsh, 303 F. Supp. 2d. 1321, 1325 (M.D. Fla. Feb. 10, 2004). However, that discretion must have been exercised consistent with its duty of good faith toward Mr. Abruscato. Id. This included the obligation to "fully investigate all claims arising from a multiple claim accident" and "minimize the magnitude of possible excess judgment." Id. In order for GEICO to have known how to minimize the magnitude of possible excess judgment, it would have needed to know which claims posed the greatest risk to Mr. Abruscato. To know which claims posed the greatest risk to Mr. Abruscato, GEICO was expected to conduct a reasonable and diligent examination of the claims against Mr. Abruscato and to reasonably evaluate their comparative worth. Otherwise, even if GEICO paid out the policy limits, it ran the risk of allocating the policy coverage in a way that did not minimize the magnitude of possible excess judgment against Mr. Abruscato.

Mr. Abruscato argues that the record shows that GEICO failed to fully investigate the claims of Mrs. Spear and the Rays, which in turn caused GEICO to improperly reject

the Rays' offer to settle their claims for $50,000.00. Supporting Mr. Abruscato's position is the testimony of Mr. Torchio who conceded that he did not consider the Investigative Report and accident reconstruction before allocating fault to Mr. Abruscato. (Doc. 87.61, p. 7, 12). Mr. Torchio said he did not know there was a possibility that Mr. Spear was intoxicated at the time of the accident. Id. at 11. A review of the Investigative Report would have made that possibility clear. Additionally, Mr. Torchio claimed an accident reconstruction was an important piece of information in analyzing the accident, and that his decision occurred prior to a consideration of an accident reconstruction. Id. at 12. Finally, Mr. Torchio went on to say he never performed an actual evaluation of Mr. Spear's possible liability in the case, but that it "would have been a potential mitigating fact." Id. at 23. Ms. Watkins, like Mr. Torchio, could not point to any written analysis of the value of the claims. See generally Id.

However, Mr. Torchio also claimed while there was no physical documentation of GEICO's analysis regarding which claims posed the greatest threat to Mr. Abruscato, the matter was "discussed." (Doc. 87.61, p. 10). Mr. Torchio defended the lack of physical documentation based on his conclusion that it was unnecessary because it was a "no brainer" that each wrongful death claim exceeded Mr. Abruscato's policy limits. Id. Moreover, Mr. Torchio stated that he determined Mr. Spear was not at fault after reviewing the initial Police Report and testimony from Mr. Abruscato and Mr. Swanda that Mr. Spear had no time to react. Id. at 20. Consistent with Mr. Torchio's testimony, Ms. Watkins said she had several discussions with Mr. Torchio regarding Mr. Abruscato's liability in the accident, including that K.L.R. was not wearing a seat belt. (Doc. 84.1, p.4).

Thus, after consideration of the record, the Court determines that reasonable jurors could disagree with the adequacy of GEICO's investigation of the claims brought against Mr. Abruscato, specifically regarding the Investigative Report and the issue of Mr. Spear's liability. If there was not an adequate evaluation of Mr. Spear's liability, then GEICO could not properly assess the risk the claims from his or his daughter's death posed to Mr. Abruscato, much less determine the relative risk of those claims to those from the death of K.L.R. As a result, reasonable jurors could conclude that GEICO's investigation was inconsistent with its good faith duty to fully investigate claims against its insured and that the Abruscato's alleged choice to settle Mrs. Spear's claims was uninformed.

Mr. Abruscato also alleges GEICO may have acted in bad faith by not classifying the accident as two separate events (two accidents), which would have increased the amount available under the policy limits. In support, he cites to Liberty Mutual Ins. Co., v. Rawls, 404 F.2d 880 (5th Cir. 1969). In Rawls, where car one struck car two, regained control after the passing of both time and distance, and then struck car three, the court found that two distinct accidents occurred. This case is factually distinct, as the record demonstrates Mr. Abruscato never regained control, and the only time and distance that passed was that which was necessary for Mr. Swanda's and Mr. Abruscato's out-of-control vehicles to collide with Mr. Spear's vehicle. Accordingly, GEICO was not unreasonable as a matter of law in its decision to treat the accident at issue as a single event.

ii. Causation

Even if Mr. Abruscato can establish that GEICO's investigation was inadequate, he must also establish GEICO's short comings caused his damages. Perera v. U.S. Fidelity and Guar. Co., 35 So. 3d 893, 902 (Fla. 2010); see also Maldonado v. First Liberty Ins. Corp., 342 F. App'x 485, 487-88 (11th Cir. 2009) (affirming summary judgment granted to insurance company where "no reasonable juror could find that the cause of the failure to settle was attributable to" the insurer). Mr. Abruscato argues "GEICO [] breached the Policy by failing to settle all claims against Mr. and Mrs. Abruscato within the Policy Limits, or if that was not possible, to settle the claim[s] [from K.L.R.'s death] [which] presented the largest potential exposure to Mr. and Mrs. Abruscato." (Doc. 1 ¶ 39.) He argues GEICO failed to settle the claims from K.L.R.'s death because GEICO "failed to investigate liability or analyze the potential exposure posed to Mr. Abruscato by each death claim." (Doc. 80, p. 3). Mr. Abruscato specifically points to the Investigative Report and accident reconstruction as the missing pieces which GEICO should have considered before making the decision to settle the claims from the deaths of Mr. Spear and C.A.S. over the claims from the death of K.L.R.

Mr. Abruscato relies almost entirely on GEICO's lack of consideration of the Investigative Report to establish GEICO's bad faith. It is clear that GEICO did not consider the Investigative Report before assigning 100% liability to Mr. Abruscato. Review of the Investigative Report, which included an accident reconstruction, reveals that Mr. Spear may have been impaired at the time of the accident. (Doc. 80.1 at 15). The report goes on to say that Mr. Spear was speeding by traveling 60mph in a 55mph zone and he was not wearing a seat belt. Id. at 14. However, the Investigative Report

does not provide any evidence that Mr. Spear's speed or intoxication contributed to the cause of the accident, or the damages suffered by any party. (See generally Doc. 80.1). In fact, the report suggests that other than the possible intoxication of Mr. Spear, he was otherwise driving normally. Id.

In addition to considering Mr. Spear's role in the accident, the Investigative Report recounts Mr. Abruscato's role. The Investigative Report reveals witness interviews that indicate Mr. Abruscato was driving recklessly by speeding as fast as 50mph in a 25mph zone, doing donuts, and ignoring stop signs. Those accounts were supported by the driver of Car Two, Mr. Swanda, who, in a separate witness interview, said Mr. Abruscato's vehicle was a "flash of blue" that "c[a]me up out of nowhere" after running a stop sign. (see Id. at 8; see also Doc. 87.11, p. 11, 13). Finally, the report reconstructed the accident, inclusive of a physical reconstruction diagram and concluded Mr. Abruscato was at fault for the accident, and responsible for the deaths of Mr. Spear, C.A.S., and K.L.R. Id. at 16. The Investigative Report was entirely consistent with the Police Report, which GEICO did consider, except for the Investigative Report's autopsy and black box results. For example the Police Report determined: (1) the cause of the accident was determined to be Mr. Abruscato's disregard for a stop sign. (Doc. 87.2, p. 2); and (2) Mr. Swanda and Mr. Spear had no improper "[D]riving/[a]ction." Id. The Police Report considered interviews with multiple witnesses in the report as well, listing Mr. Abruscato as a "Violator" "Pending Investigation." Id. Thus, all of the evidence available to GEICO at the time of settlement, including the Police Report, the Investigative Report and accident reconstruction, and witness interviews are such that no reasonable jury could find a link between GEICO's alleged failure to fully investigate

the claims made against Mr. Abruscato and GEICO's decision to assign 100% liability to Mr. Abruscato for the accident.

Mr. Abruscato relied on a theory that GEICO was unreasonable in assigning no fault to Mr. Spear for the accident. Since GEICO was unreasonable for assigning no fault to Mr. Spear, the argument goes, GEICO was unreasonable for assigning the greatest value to the deaths of Mr. Spear and C.A.S. See Doc. 1; see also Doc. 80, p. 4 ("Because GEICO blamed Mr. Abruscato from the start, it failed to settle the Rays' claim against him when it could and should have done so."). In light of the Court's finding that GEICO was reasonable, as a matter of law, for assigning Mr. Abruscato 100% fault for the accident and no fault to Mr. Spear, Mr. Abruscato's claim against GEICO for settling in bad faith cannot proceed. The parties do not dispute that absent fault on behalf of Mr. Spear that GEICO was reasonable in assigning the most value to the death of Mr. Spear followed by the deaths of C.A.S. and K.L.R. Indeed, the record is clear that the claim from Mr. Spear's death was worth the most followed by the claims from the deaths of C.A.S. and K.L.R.[4]

---

[4] Florida law allows damages for wrongful death for loss of support and services, companionship, and pain and suffering (of the person bringing suit), along with the deceased's medical and funeral expenses. Knowles v. Beverly Enterprises-Florida, Inc., 898 So. 2d 1, 9 (Fla. 2004) (citing § 768.21, Fla. Stat.). Mr. Spear's dual role as husband and father increased the value of Mrs. Spear's wrongful death claim, as did his status as lone provider for his family (which included multiple children in addition to his wife). (Doc. 87.61, p. 16).[4] While it is possible Mr. Spear's lack of seatbelt contributed to his own death, any diminution in the value of his claim for this reason would also diminish the value of the claims made from K.L.R.'s death, as she was not wearing a seatbelt either.

Furthermore, the record indicates approximate equality of the claims from the deaths of C.A.S. and K.L.R. They were both minors situated similarly, though the value of the claims from K.L.R's death was somewhat diminished because of comparative negligence in her not wearing a seatbelt, while no such diminution can be attributed to C.A.S. Moreover, the record demonstrates the claims from the deaths of C.A.S. and Mr.

It is undisputed that GEICO met the other prongs of its duty to act in good faith including: attempting to settle all of the claims against Mr. Abruscato within the policy limits; its willingness to pay the policy limits in full; keeping Mr. Abruscato informed of the resolution process; and advising the Abruscato's of the risk adverse judgment and how to avoid it. See Marsh, 303 F. Supp. 2d at 1325. Since Mr. Abruscato's attack arises from an allegation GEICO did not fully investigate, and that alleged shortcoming caused no harm, GEICO cannot be said to have caused Mr. Abruscato to suffer an excess judgment by settling the claims from the deaths of Mr. Spear and C.A.S. where global settlement was not possible. See Harmon v. State Farm Mut. Auto Ins. Co., 232 So. 2d 206 (Fla. 2d DCA 1970) (holding that insurance companies have wide discretion to settle some claims to the exclusion of others).

iii. GEICO's Conduct at Trial

In addition to his claim of bad faith by GEICO in the settlement of his case, Mr. Abruscato also alleges that GEICO acted in bad faith in conducting his legal defense at trial.[5] GEICO hired attorney Laurie Adams ("Ms. Adams") to handle Mr. Abruscato's case and had previously informed Mr. Abruscato that he could choose to retain his own counsel at his personal expense. (See 85.15). Mr. Abruscato does not accuse GEICO

---

Spear came as a package. Mrs. Spear was the claimant for both C.A.S. and Mr. Spear, as they were father and daughter and their claims had been treated as a package through the claims process. (See Doc. 87.24) ("[Mrs. Spear's] claims represent the most significant excess judgment risk to Mr. Abruscato."). Thus, the dynamics of the settlement process required GEICO to settle K.L.R.'s wrongful death claim to the exclusion of the claims from the deaths of C.A.S. and Mr. Spear or vice versa, if a global settlement could not be achieved.

[5] The Rays sued both Mr. Spear and Mr. Abruscato for the death of K.L.R. The jury found that Mr. Spear was not "a legal cause of the loss, injury, or death" of K.L.R., and that Mr. Abruscato was. (Doc. 87.58). The jury apportioned 80% fault to Mr. Abruscato and 20% fault to K.L.R. Id.

of bad faith for hiring Ms. Adams. Instead, Mr. Abruscato alleges Ms. Adams acted in bad faith by "present[ing] expert testimony that placed the majority of liability for K.L.R.'s death on its own insured, [Mr.] Abruscato." (Doc. 1 ¶ 41).

The Rays were the Plaintiffs in the case, suing both Mr. Spear and Mr. Abruscato for the death of K.L.R. No one argued Mr. Swanda was in anyway responsible for the accident, which left liability for the accident on Mr. Spear or Mr. Abruscato or some combination thereof. Before the trial began, Ms. Adams performed a detailed pretrial investigation, which included an analysis of Mr. Abrusacto's best chance for mitigating his liability for the death of K.L.R. (Doc. 85-15). The analysis included a detailed review of the medical examiner's report as to the cause of K.L.R.'s death. Id. at 3. Ms. Adams considered the information from the "black box" inside Mr. Abruscato's vehicle, as well as the opinions from Andy Fore, an accident reconstructionist. Id. 4-5. After her examination of the various anticipated testimonies of the experts, Ms. Adam's made a strategic decision to attack the causation of K.L.R.'s death by attributing her death to her not wearing a seatbelt.[6] However, in order to establish that K.L.R.'s death was caused by her lack of a seatbelt, Ms. Adams was forced to rely on the testimony of Dr. Augenstein, who was also of the opinion that Mr. Abruscato caused the accident.

Mr. Abruscato now argues that Ms. Adam's strategy to call Dr. Augenstein was demonstrative of bad faith because he placed the cause of the accident on Mr. Abruscato. However, Dr. Augenstein's expert opinion had the benefit of being the only one supportive of the theory that K.L.R.'s wearing of a seat belt would have saved her

[6] The Rays offered experts to say that K.L.R's lack of seat belt made no difference in her death.

life. There was already planned testimony that Mr. Spear was not at fault for causing the accident. While the record indicates the Rays employed multiple experts to establish the fault of Mr. Spear, (See Doc. 85.15), further review of the record shows multiple witnesses were willing to testify that Mr. Spear was not a cause of the accident. For example, the evidence included: Dr. Schauben's opinion that no one could legitimately conclude Mr. Spear was impaired; accident reconstructionist Alan Moore's opinion that Mr. Spear did not have time to react to the accident regardless of impairment; Vicki Paramour's observation that Mr. Spear was driving normally immediately before the crash; and Major Jeff Johnson's opinion that Mr. Spear had no time to take evasive action. Id. Moreover, Mr. Abruscato previously admitted he was negligent in causing the accident. Id. at 4; (see also Doc. 87-55) ("I accept that I was speeding and I caused an accident that caused the death of people. I do say I did it."). His admission was consistent with the testimony of almost all of the witnesses. See generally Id. Thus, the record is clear that Dr. Augenstein's opinion that Mr. Abruscato caused the accident was cumulative, while his testimony that K.L.R. would have lived had she been wearing a seat belt was critical.

Accordingly, no reasonable jury could find that Ms. Adam's defense of Mr. Abruscato was carried out in bad faith. The fact that Mr. Abruscato is unhappy with the outcome of the trial does not mean the trial strategy employed by Ms. Adams gives rise to a legitimate cause of action against GEICO for bad faith defense, especially where the trial strategy is reasonable in light of the record and where the insured was advised of his right to seek alternative representation. See Novoa v. GEICO, 542 F. App'x 794,

796 (11th Cir. 2013) (rejecting the insured's contention that bad faith existed where insurer "could have" done better or chosen a different strategy).

Accordingly, after due consideration, it is

**ORDERED:**

1. Plaintiff's Motion for Summary Judgment [Doc. 80] is **DENIED**.

2. Defendant's Motion for Summary Judgment [Doc. 86] is **GRANTED**.

3. The Clerk is directed to enter judgment in favor of Defendant, GEICO Insurance Company, and against Plaintiff, Edward Abruscato.

4. The Clerk is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE** and **ORDERED** in Jacksonville, Florida this 13th day of August, 2014.

BRIAN J. DAVIS
United States District Judge

mw
Copies furnished to:

Counsel of Record